Present:  Kinser, C.J., Lemons, Goodwyn, Millette, and Mims, JJ., and Russell and Lacy, S.JJ.


GARDINER S. MULFORD, ET AL.

v.  Record No. 100333      OPINION BY JUSTICE WILLIAM C. MIMS
                                    June 9, 2011
WALNUT HILL FARM GROUP, LLC

FROM THE CIRCUIT COURT OF CULPEPER COUNTY
J. Howe Brown, Jr., Judge

In this appeal we consider whether the circuit court erred in finding that appellant Gardiner S. Mulford ("Mulford") did not have a legal right to access property that he owned in Culpeper County.

FACTS

We will state the facts in the light most favorable to Walnut Hill Farm Group, ("Walnut Hill") the prevailing party below. Prospect Dev. Co. v. Bershader, 258 Va. 75, 80, 515 S.E.2d 291, 294 (1999).  We recite only those facts relevant to the issues presented in this appeal.  Patel v. Anand, L.L.C., 264 Va. 81, 83, 564 S.E.2d 140, 142 (2002).

In 2006, Mulford, a real estate broker, purchased a tract of land comprised of 78.26 acres ("the "property") in southeastern Culpeper County.  Mulford purchased the property after being advised by the seller that it might be landlocked and reviewing an appraisal that concluded an access easement would need to be acquired.  The appraisal also reflected that

the property, as shown on Culpeper Tax Map 55-B, was subdivided for residential development into eighteen lots, zoned A-1, of approximately four acres each.[1]

In the real estate contract, the parties struck out, and Mulford initialed, language guaranteeing an easement for access. The seller conveyed the property to Mulford by special warranty deed with a quitclaim as to any such easement.[2]

Mulford had visited the property in 2002 to determine if there was access to a public road. During that visit, he discovered the sunken remains of an old plank road ("the roadbed"), now grown over, and walked from Route 610 to the property along it. Based on this discovery, Mulford believed there was an easement to access the property.

Mulford conducted his own title search of the property and also purchased title insurance, issued in July 2006, which ensured a right of access by way of a roadway appearing in the various plats and corresponding to the roadbed he discovered during his visit in 2002. The chain of title, dating back to

---

[1] The date of the county's approval of the subdivision is not in the record. However, Mary Leftwich, owner of an adjoining property, testified that the property was subdivided in the early 1960s.

[2] By deed dated December 11, 2006, Mulford conveyed the property to Mulford @ Godfreys, L.L.C., of which he was the sole member.

1833, indicated a roadway corresponding generally to the one Mulford had seen, with a variety of names, including the Brandy Road, Thornton Road, Old Stony Ford Road, Fredericksburg Plank, and Bundytown Road.

As it appears in the various title documents, the roadway is nearly two miles long and traverses farms and undeveloped land between Routes 610 and 724 to the south, and Route 672 to the north. Between Mulford's tract and Route 610, the visible roadbed traverses land owned by Walnut Hill. On the plats in both Mulford's and Walnut Hill's chains of title, the roadway appears to provide the sole means of ingress and egress for the Mulford property.

The property and that portion of Walnut Hill's tract that is east of the roadway were once part of a much larger estate. Prior to 1866, William Redd owned approximately 925 acres on the east side of the roadway, which he labeled "Brandy Road" on the plat attached to his will. Pursuant to his will, the land was severed into six tracts, including a timber dower along the roadway.[3] The timber dower, which later became known

---

[3] Joy Herndon, one of Mulford's expert witnesses, explained that Redd's widow "elected or was instructed to take her portion of the estate through this partition." Because the tract set aside for her did not have timber needed for heat, she also was allotted this additional tract for timber. The widow's tract does not adjoin the timber dower, and the roadway does not appear on the plat to have provided the means of access from the widow's tract to the timber dower.

as Godfrey's Retreat, is the property that Mulford purchased in 2006.  Another tract, identified as "Son No. 3" in the 1866 plat, bordered the dower tract to the south and the roadway to the east.  It is the origin of title for that portion of Walnut Hill's tract east of the road.

After the purchase, Mulford visited the property on horseback.  He testified that the roadbed was grown over with "[s]aplings and stickers and brush."  He began preparing to clear the roadbed, including putting stakes in the ground to keep vehicles from using it.  Mulford testified that he learned from a neighboring landowner that Walnut Hill disapproved of his activities.

Shortly thereafter, Mulford received a letter from Daniel J. LaBriola, managing partner of Walnut Hill.  LaBriola wrote that he had learned Mulford was trespassing on Walnut Hill's property and cutting standing timber.  He advised Mulford to cease trespassing immediately.  Mulford responded with a letter informing LaBriola that he would exercise what he asserted to be his deeded right of way between Route 672 and 724 "to the fullest degree."

Mulford continued to access his property via the roadbed. Walnut Hill posted trespass notices on its property.  One of the signs read: "NO TRESPASSING.  READ THIS SIGN: THIS PROPERTY IS OWNED BY THE WALNUT HILL FARM GROUP NOT BY

4

GARDINER MULFORD: MR MULFORD DOES NOT HAVE AN EASEMENT, RIGHT OF WAY OR OTHER ACCESS TO THIS PPOPERTY HE IS TRESPASSING IF YOU TRESPASS ON HIS BEHALF YOU WILL BE PROSECUTED."

In a letter dated September 4, 2007, James E. Madden ("Madden"), Walnut Hill's financial manager, warned Mulford that he was trespassing and stated that if Mulford entered Walnut Hill's property, a criminal warrant for trespass would be issued for his arrest. Following receipt of that letter, Mulford began to clear the roadbed.

On September 12, 2007, Madden filed a criminal complaint against Mulford, alleging that Mulford trespassed on his property on August 26, 2007 by foot and on August 27, 2007 by tractor. Mulford was arrested for trespassing, and the complaint resulted in an order of nolle prosequi. After Mulford initiated a tort suit against Walnut Hill and Madden, Walnut Hill filed a complaint against Mulford with the Greater Piedmont Area Association of Realtors, Inc. ("GPAAR"), a body that has regulatory authority over Mulford's activities as a realtor.

PROCEEDINGS

On November 5, 2007, Mulford filed a four-count complaint against Walnut Hill and Madden (collectively "Walnut Hill") for defamation for stating that Mulford was trespassing, insulting words for the posted "No Trespassing" signs

5

identifying Mulford as a trespasser, and malicious prosecution and false imprisonment for his arrest. He alleged that the roadbed was a lawful, recorded easement described in the land records as Stony Ford Road, Brandy Road, Thornton's Road, and Bundy Town Road.

Walnut Hill filed an answer, and then an amended answer. Walnut Hill also filed a counterclaim against Mulford and third-party defendant Mulford @ Godfrey's L.L.C. ("Godfrey's"), the record owner of the tract at that time, alleging trespass and seeking injunctive relief barring Mulford and his successors in title from entering its property. Alternatively, if the circuit court determined that "any lawfully established road" did exist, the counterclaim sought a determination that it was only eight feet wide.[4]

Mulford and Godfrey's filed an answer to the counterclaim in which they asserted that Walnut Hill was estopped from denying the existence of the easement because the deeds to its predecessors in title mentioned it under its various names. Third-party defendant Godfrey's filed a counterclaim against Walnut Hill for declaratory judgment that the 35-foot-wide "lawful easement and/or right-of-way" existed and seeking

---

[4] Walnut Hill's counterclaim also included a claim against a third party; that claim is not within the scope of this appeal.

6

injunctive relief barring Walnut Hill from restraining Mulford's use of it. In its answer to Godfrey's counterclaim, Walnut Hill again denied the existence of the easement.

Mulford then filed an amended complaint against Walnut Hill alleging defamation per se for Walnut Hill's letter to the GPAAR, use of insulting words in the no trespassing sign, and malicious prosecution and false imprisonment for instigating the criminal trespass arrest. In his amended complaint, he again asserted the existence of a recorded, approximately 35-foot-wide easement. Thus, he contended, Walnut Hill's actions had been vindictive and without lawful authority.

Walnut Hill subsequently filed an amended answer, denying the existence of any public road or any recorded easement. It also filed a demurrer asserting that the statements set forth in the amended complaint were not defamatory and that nothing in the no trespassing sign constituted insulting words.

The circuit court sustained the demurrer as to Mulford's defamation and insulting words claims to the extent those claims were based on the criminal trespass warrant. The order noted that counsel agreed "that the Amended Complaint does not seek declaratory or injunctive relief with regard to the alleged easement."

7

Mulford subsequently moved to bifurcate the proceedings to separate the competing claims for declaratory judgment and injunctive relief in the counterclaims from the tort claims in his complaint.  After a hearing, the circuit court granted the motion.[5]

The matter proceeded to trial on Walnut Hill's counterclaims against Mulford for injunctive relief, and on Mulford's counterclaim against Walnut Hill for injunctive relief.  In his bench brief and at trial, Mulford relied on three theories of recovery: that the roadbed was a public road, that Walnut Hill was equitably estopped to deny the existence of a right of way in its chain of title, and that Mulford was entitled to a prescriptive easement.[6]

Following a trial on the question of whether an easement existed, the circuit court determined that the various references to the roadway in the deeds to Walnut Hill's

---

[5] After the bifurcation order and the pre-trial scheduling order, but prior to trial, Mulford, as manager of Godfrey's, executed a deed of rescission on April 22, 2009 conveying all interest in the land back to Mulford individually.

[6] Mulford did not advance a theory of easement by implied grant based on the severance of unity of title in 1866 by the will of William Redd.  See, e.g., Carter v. County of Hanover, 255 Va. 160, 167, 496 S.E.2d 42, 45 (1998) ("An easement from previous use comes into existence because absent express restrictions imposed by the terms of the grant, a grantor of property conveys everything that is necessary for the beneficial use and enjoyment of the property.") (internal quotation marks omitted).

predecessors in title did not estop Walnut Hill from denying the existence of the easement because there was no representation by Walnut Hill to Mulford that an easement existed or that he could use the portion of the roadbed that crossed its property. Moreover, the prior owner informed Mulford prior to the sale that there was no easement and that the parcel was landlocked.

The circuit court then determined that Mulford failed to prove by clear and convincing evidence that an easement existed. The court found that a roadbed existed and had been used in the area designated as the roadway by the various surveys and maps Mulford introduced as evidence. However, the mere existence and use of the roadbed was insufficient to establish an easement. According to the circuit court, there was no evidence that the roadway shown in the surveys and maps was a public road because Mulford failed to show any public use in the last hundred years – in fact, it was overgrown and impassible until Mulford attempted to clear it – or that it had been accepted as a public road by any public authority. Finally, Mulford failed to prove a prescriptive easement because there was "no direct evidence that [Mulford's predecessors in title] ever used the road."

Accordingly, the circuit court entered a final order denying Mulford's claim that Walnut Hill was estopped from

denying the existence of an easement and finding that Mulford had failed to prove its existence.  Mulford appeals.

## DISCUSSION

### A. PUBLIC ROAD

Mulford first assigns error to the circuit court's ruling that the roadway was not a public road that he could use to access his land.  The question of whether the roadway was a public road under Virginia law presents a mixed question of law and fact.  Because the circuit court heard the evidence ore tenus, its factual findings are "entitled to the same weight as a jury verdict, and [we are] bound by the chancellor's findings of fact unless they are plainly wrong or without evidence to support them."  Westgate at Williamsburg Condo. Ass'n v. Philip Richardson Co., 270 Va. 566, 573, 621 S.E.2d 114, 117-18 (2005) (citation and quotation marks omitted).  However, the ultimate conclusion as to whether the roadway was a public road is reviewed de novo.

"Dedication is an appropriation of land by its owner for the public use."  Greenco Corp. v. City of Virginia Beach, 214 Va. 201, 203, 198 S.E.2d 496, 498 (1973).  At common law, "for a road to be dedicated to the public, there must be an offer made by the landowner and an acceptance by the public."  Bradford v. Nature Conservancy, 224 Va. 181, 198, 294 S.E.2d 866, 875 (1982).  "Although acceptance may be implied in urban

10

areas, a formal acceptance or express assertion of dominion over the road by public authority is required before dedication of a rural road is complete." Burks Bros. of Virginia, Inc. v. Jones, 232 Va. 238, 248, 349 S.E.2d 134, 141 (1986).

In Bradford, we explained the rationale behind the rule requiring formal acceptance by the public of a rural road:

> While a dedication may be implied from the acts of the owner, these acts must be unmistakable to show the intention of the landowner to permanently give up his property. This Court has long recognized that what may amount to a dedication in an urban area will not serve the same purpose in a rural one. This is because landowners in rural areas frequently allowed roads to be opened through their property without intending a dedication to the public. Just as important, the government might not have any intention to accept the road and be responsible for its maintenance. Thus, before a rural road can be dedicated, there must be a formal acceptance by the public.

Id. at 198-99, 294 S.E.2d at 875 (internal citations and quotation marks omitted).

By contrast, in urban areas acceptance can occur through "'such long use by the public as to make reclamation unjust and improper.'" Greenco, 214 Va. at 204, 198 S.E.2d at 489 (quoting Buntin v. City of Danville, 93 Va. 200, 204, 24 S.E. 830, 830 (1896). In Greenco, we found acceptance of a strip of land where the general public had used it regularly for 70 years for beach access and where the City of Virginia Beach

11

treated it as any other street and built a boardwalk on the ocean side of it.  Id. at 208, 198 S.E.2d at 502.

The General Assembly also has provided for the recognition of a way as a public road by statute:

> When a way has been worked by road officials as a public road and is used by the public as such, proof of these facts shall be prima facie evidence that the same is a public road.  And when a way has been regularly or periodically worked by road officials as a public road and used by the public as such continuously for a period of twenty years, proof of these facts shall be conclusive evidence that the same is a public road.

Code § 33.1-184.

At trial, Mulford had the burden of establishing the roadway as a public road, either by common law or by statute. City of Staunton v. Augusta Corp., 169 Va. 424, 433, 193 S.E. 695, 698 (1937) ("Since we know that individual owners of property are not apt to transfer it to the community or subject it to public servitude without compensation, the burden of proof to establish dedication is upon the party alleging it.").  The parties do not dispute that the roadway was situated in a rural area.  Therefore Mulford was required to prove that the roadway was "worked by road officials as a public road and . . . used by the public as such," Code § 33.1-184, or "a formal acceptance or express assertion of

12

dominion over the road by public authority."  Burks Bros. of Virginia, 232 Va. at 248, 349 S.E.2d at 141.

The circuit court found that the roadway never was formally accepted, or worked, or maintained by any public authority.  We will not disturb this finding of fact unless plainly wrong or without evidence to support it.  Westgate, 270 Va. at 573, 621 S.E.2d at 117-18.

Mulford presented evidence of ancient public use through Walnut Hill's expert witness, Eugene Scheel, an historian and mapmaker.  Scheel testified that the roadway was in use before the American Revolution, and the Marquis de Lafayette may have used it in 1781 when marching his troops to Yorktown.  In the course of mapmaking unrelated to this litigation, Scheel prepared several maps of Culpeper County in which he labeled the roadway "Fredericksburg Plank Road."  In 2009, Culpeper County published a historical map drawn by Scheel depicting Civil War battles, skirmishes, and fortifications.  The roadway is identified as Fredericksburg Plank Road.  The map was privately sponsored.

Scheel speculated that the road was probably planked "by certain people using their help or slaves who wanted to make a portion of the travel way traversable through their property" or "by the local people who were hired by the viewers of the

13

area.  It may have been re-planked during the civil war by the troops themselves or by followers of the troops."

Scheel concluded that the Fredericksburg Plank Road was not a public road.  He found no indication from county court records or board of supervisors minutes recognizing the road prior to the Byrd Act.[7]  In 1921, in conjunction with road funding from the Commonwealth, Culpeper County created a map of its roads.  Scheel testified that the roadway does not appear on that map.

Viewing the facts in the light most favorable to Walnut Hill, we cannot say that the circuit court was plainly wrong in finding as a matter of fact that a public body did not accept an offer to dedicate the roadway.  Id.  Because Mulford failed to prove the requisite "formal acceptance or express assertion of dominion over the road by public authority," Burks Bros. of Virginia, 232 Va. at 248, 349 S.E.2d at 141, we need not address whether there was an offer to dedicate the roadway.

B. PRESCRIPTIVE EASEMENT

---

[7] Since the passage of the Byrd Road Act in 1932, the Commonwealth of Virginia and its agencies have been responsible for secondary road maintenance and construction in all but two of Virginia's counties.  See Godwin v. Board of Sup'rs, 161 Va. 494, 500, 171 S.E. 521, 523 (1933); Code § 33.1-12, -228, -229.

14

Mulford next assigns error to the circuit court's finding that he did not have a prescriptive easement for ingress and egress. We recently explained the applicable standard by which we review the ruling of the circuit court:

> Issues of adverse possession and prescription present mixed questions of law, reviewed de novo, and fact, to which the reviewing court gives deference to the determination of the trial court. . . . Thus, we must give deference to the court's judgment by reviewing the evidence in the light most favorable to . . . the prevailing party. Taking that view of the evidence, we will then apply it to the law of adverse possession and prescription de novo.

Scott v. Burwell's Bay Improvement Ass'n, 281 Va. 704, 709, ___ S.E.2d ___, ___ (2011).

Virginia law requires clear and convincing evidence to establish a prescriptive easement. Id. For Mulford to establish a prescriptive easement over Walnut Hill's land:

> it must appear that the use of the roadway by the claimant was adverse, under claim of right, exclusive, continuous, uninterrupted, and with knowledge and acquiescence of the owner of the land over which it passes, and that such use has continued for a period of at least twenty years.

Martin v. Proctor, 227 Va. 61, 64-65, 313 S.E.2d 659, 661 (1984) (citing Craig v. Kennedy, 202 Va. 654, 657-58, 119 S.E.2d 320, 322-23 (1961)). The use will be presumed to be under a claim of right when "there has been an open, visible,

15

continuous and unmolested use of a road across the land . . . for at least twenty years." Id.

At trial, Mulford conceded that there was no direct evidence that any of his predecessors in title ever used the property or the road. However, he introduced aerial photographs taken in 1937, 1980, and 1994 that showed the visible existence of a roadway. Scheel traced the visible roadbed in the 1980 and 1994 photos. Mulford argues that these photographs "show that someone had to be using Brandy Road to access Godfrey's Retreat, as well as other properties without alternative access."

Walnut Hill offered the testimony of Mulford's immediate predecessor in title, who owned the property for more than twenty years and never made use of it because there did not appear to be access. That owner asked for and was granted a reprieve on real estate taxes by the County based on the lack of access.

Mary Leftwich lived on property that bordered Mulford's tract. She testified that since 1967, when she moved to the area, she had never seen anyone use the roadbed. She described it as having "always been grown up and woods. . . . You couldn't never hardly walk down and I don't know how you could do anything else." In 1967, her family erected a barbed wire fence that crossed and blocked the roadbed until Mulford

16

tore it down in 2007.  She further testified that Mulford's tract has never been developed in any way, and that no one has ever lived on the property.

Neighboring landowner Larry Terry testified that he and Mulford walked in the vicinity of the roadbed, but that it was a "wilderness" with trees as large as 18 inches in diameter. It was impossible for Terry to discern its path because of the growth.

Mulford's own witness, Richard Suthard, testified that it would be impossible to drive a truck the full length of the roadbed from Route 672 and 724 because of the growth, which included trees with circumference similar to "a big Mountain Dew bottle. . . . two, three, four inches."

The circuit court held that Mulford had not proven the elements of prescription by clear and convincing evidence.  It found that Mulford had not shown that any of his predecessors ever used the roadway to access the property and that the inference that someone must have used the roadway since it appeared to provide the sole access to the property did not rise to the level of clear and convincing evidence.

Viewing the evidence in the light most favorable to Walnut Hill, Scott, 281 Va. at 709, ___ S.E.2d at ___, we cannot say that the trial court's finding of fact regarding lack of use by Mulford's predecessors was plainly wrong or

17

that the circuit court misapplied the law of prescription. Id. While Mulford showed that a roadway existed and that unknown people used it prior to his immediate predecessor, he did not link that general historical use to his predecessors in title. It appears from the evidence that those predecessors never lived on or erected any structure on the property, which initially was platted as a timber tract. Mulford did not "introduce clear and convincing evidence to prove the date or period of time when all of the elements of proof for adverse possession or prescription were first established" or "show that the prior occupants were asserting the same claims to . . . a prescriptive easement over[] the property in question." Id. at 712-13, ___ S.E.2d at ___.

### C. EQUITABLE ESTOPPEL

Mulford next assigns error to the circuit court's ruling that Walnut Hill was not estopped from denying a right of way. On brief and at oral argument, Mulford asserted that Walnut Hill did not have "clean hands" because the roadway appears throughout its chain of title and in its title insurance policy as an exception to coverage.

To establish equitable estoppel, Mulford was required to prove "by clear, precise, and unequivocal evidence" (1) that Walnut Hill falsely represented that there was an easement serving Mulford's tract; (2) that Walnut Hill did so with

knowledge that there was no easement; (3) that Mulford was ignorant of the truth; (4) that Walnut Hill intended that Mulford act on the representation; (5) that Mulford was induced to act upon it; and (6) that Mulford "was misled to his injury." See Boykins Narrow Fabrics Corp. v. Weldon Roofing & Sheet Metal, Inc., 221 Va. 81, 86, 266 S.E.2d 887, 890 (1980).

We need not address each element of equitable estoppel, as set forth in Boykins Narrow Fabrics, because Mulford did not prove or even allege that Walnut Hill ever made any representation regarding an easement upon which he relied. Accordingly, we hold that the trial court did not err in finding that Mulford failed to establish that Walnut Hill should be equitably estopped from denying the easement.

### D. BURDEN OF PROOF

In Mulford's fourth assignment of error, he asserts that Walnut Hill bore the burden of proof to establish that no easement or right-of-way existed because it sought to "close" an existing easement or right-of-way. This argument is without merit.

The question of which party bears the burden of proof is a question of law. E.g., Dan's Supermarket v. Pate, 33 P.3d 1121, 1124 (Wyo. 2001) ("[a]llocation of the burden of proof is a matter of law"); Fischer v. State Dep't of Soc. & Rehab.

19

Servs., 21 P.3d 509, 515 (Kan. 2001) ("determination of which party shall bear the burden of proof is a question of law"); Suydam v. Commercial Fisheries Entry Comm'n, 957 P.2d 318, 322 (Alaska 1998) ("[d]etermining the appropriate burden and deciding who bears it are questions of law").  We review questions of law de novo.  Government Emp. Ins. Co. v. United Servs. Auto. Ass'n, 281 Va. 647, 655, ___ S.E.2d ___, ___ (2011).

Mulford initially pled the existence of an easement in his complaint to establish his claims of insulting words, malicious prosecution, and false imprisonment: these claims are predicated on the notion that Mulford was not trespassing when he used the portion of the roadbed traversing Walnut Hill's parcel.  Likewise, his counterclaim for declaratory judgment and injunctive relief sought to establish the easement and bar Walnut Hill from restraining his use of it.

It is well-established that the party who claims an easement bears the burden of proving the fact.  Both declaration and enforcement of an easement are equitable remedies, and he who seeks such equitable relief must prove "the facts that give rise to the easement, whether by express grant or reservation, by implication, or by other means."  Brown v. Haley, 233 Va. 210, 216-17, 355 S.E.2d 563, 568

20

(1987).  This includes easements by prescription.  <u>Nelson v.</u>
<u>Davis</u>, 262 Va. 230, 235, 546 S.E.2d 712, 715 (2001).

Mulford's argument on appeal incorrectly presupposes the existence of the easement and demands that Walnut Hill disprove it.  This argument may be relevant if Walnut Hill had admitted an easement existed but claimed it had been abandoned:  a party who claims an existing easement has been abandoned does bear the burden of proving it.  <u>Pizzarelle v.</u>
<u>Dempsey</u>, 259 Va. 521, 528, 526 S.E.2d 260, 264 (2000).
However, Walnut Hill never admitted – either in its answers, its counterclaim, or at trial – that an easement once had existed but had been abandoned.  Rather, Walnut Hill denied that an easement ever existed.  Accordingly, because there was no basis on which to presuppose the existence of the easement, the circuit court did not err when it required Mulford to prove its existence.

## CONCLUSION

For the reasons stated above, we will affirm the judgment of the circuit court.

<u>Affirmed.</u>

21