Present: Kinser, C.J., Lemons, Goodwyn, Millette, Mims, McClanahan, JJ., and Koontz, S.J.

JEAN MOREAU & ASSOCIATES, INC.

OPINION BY
v.   Record No. 101352   JUSTICE LEROY F. MILLETTE, JR.
January 13, 2012
HEALTH CENTER COMMISSION FOR THE
COUNTY OF CHESTERFIELD, d/b/a LUCY CORR VILLAGE

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Frederick G. Rockwell, III, Judge

Jean Moreau & Associates, Inc. (Jean Moreau) brought this suit against The Health Center Commission for the County of Chesterfield (HCC or Commission), seeking a declaratory judgment and alleging claims for breach of contract and quantum meruit. The circuit court, on HCC's plea in bar, dismissed Jean Moreau's claims. It held that the breach-of-contract claim was barred because Jean Moreau did not comply with the contractual-claims procedure of the Virginia Public Procurement Act, Code §§ 2.2-4300 through 2.2-4377, and that the quantum meruit claim was barred by the doctrine of sovereign immunity because it arose out of HCC's exercise of a governmental function. For the reasons that follow, we will affirm the judgment of the circuit court.

I.  BACKGROUND

In 1993, after finding "that the public health and welfare . . . require[d] the acquisition, construction, and operation of public hospital facilities," Chesterfield County

1

established HCC "for the purpose of operating nursing homes, hospital or health center facilities."  Following its creation, HCC took over operation of Lucy Corr Village, a nursing-care facility, which had previously been managed by Chesterfield County.  A few years later, in 1999, HCC expanded Lucy Corr Village to include an assisted-living facility.  During this time, Lucy Corr Village was operating at a loss of approximately $1.5 million each year, so Chesterfield County was providing HCC with "financial assistance and subsidies for indigent care" to keep Lucy Corr Village solvent.

HCC decided to expand Lucy Corr Village again in 2002 to add an independent-living facility.  Such a facility would allow Lucy Corr Village to become a continuing care retirement community (CCRC) – a community that offers several levels of health care on one campus:  an independent-living facility, an assisted-living facility, and a nursing-care facility.  A CCRC allows residents to "[a]ge in place," living independently in single-family homes or apartments as long as possible and then transferring into skilled-care facilities when assistance with activities of daily living becomes necessary.  In addition to making Lucy Corr Village a CCRC, an independent-living facility would allow the community "to be financially stable without the need for county subsidy."

In 2004, HCC awarded Jean Moreau a five-year contract to plan and develop the independent-living facility, which would be named "Springdale at Lucy Corr Village." Under the terms of the contract, Jean Moreau was to receive a monthly fee of $20,000. It also was to receive a "Development Fee" and a "Marketing Fee," together totaling $2.25 million (but not to exceed 6% of HCC's expenditures on the project), after certain financing and construction conditions had been met. The "continuation of the terms . . . of [the] contract beyond June 30 of any year [was] subject to its approval and ratification by [HCC]."

On May 4, 2006, HCC voted to "discontinue the contract with Jean Moreau . . . as of June 30, 2006." It sent a letter to Ms. Jean Moreau, Jean Moreau's president, on May 8, notifying her of the decision. Roughly one month later, on June 9, Ms. Moreau responded. In a letter to HCC, Ms. Moreau claimed that Jean Moreau was owed "development fees" that had been "deferred until the Bond financing." She also said that she "wanted to give [HCC] a 'heads up' that [she] intend[ed] to seek legal remedy regarding these fees."

Ten days later, on June 19, HCC sent a letter to Ms. Moreau responding to her "comments regarding unpaid fees due to Jean Moreau." In that letter, HCC said that it believed that Jean Moreau had been fairly compensated in accordance

3

with the terms of the parties' contract.  If Ms. Moreau disagreed, it went on to say, then she should have her attorney submit in writing "the amount owed [and] the contractual term giving rise to an obligation to [Jean Moreau]."

Jean Moreau later submitted nine invoices to HCC for work performed during the 2005-2006 fiscal year.  HCC paid the invoices on July 31, 2006.  Almost three months later, on October 24, Jean Moreau's attorney sent a letter to one of HCC's members stating that Jean Moreau was willing to mediate the issue of the claimed deferred development fees.  In a January 3, 2007 letter, HCC responded that it did not agree with the position Jean Moreau "appear[ed] to offer" – namely, that there were additional payments due under the contract – and that no basis for mediation had been provided.

Roughly two weeks after HCC rejected its offer to mediate, Jean Moreau brought this suit against the Commission, requesting declaratory judgment of the parties' rights and responsibilities under their contract, and asserting claims for breach of contract and quantum meruit.  In its complaint, Jean Moreau alleged that HCC's termination of the parties' contract "did not relieve [the Commission] of paying [Jean] Moreau deferred compensation under the contract."  Jean Moreau sought $2.25 million.

HCC filed a plea in bar. It contended that the breach-of-contract claim was barred because Jean Moreau did not comply with the Procurement Act's contractual-claims procedure. HCC further argued that the quantum meruit claim was barred by the doctrine of sovereign immunity because: (1) as an entity created by a county, the Commission was entitled to absolute immunity; and (2) the development of Springdale was a governmental function.

After conducting a hearing and taking evidence, the circuit court sustained HCC's plea in bar. As for the breach-of-contract claim, the circuit court held that it was barred because Jean Moreau did not follow the Procurement Act's contractual-claims procedure. In particular, the circuit court found that, while Jean Moreau filed a notice of intent to file a claim with HCC in its June 9, 2006 correspondence, it subsequently failed to submit the claim or, in the alternative, submitted it beyond the 60-day limitations period provided under Code § 2.2-4363(C)(1). As for the quantum meruit claim, the circuit court disagreed that HCC was immune from the claim on the basis of absolute immunity. Nevertheless, the circuit court ultimately concluded that HCC was immune from the quantum meruit claim because the development and operation of Springdale were "actions taken in

5

its governmental capacity."  The circuit court accordingly dismissed Jean Moreau's claims with prejudice.

Jean Moreau now appeals the dismissal of its claims, and HCC cross-appeals the circuit court's ruling that it was not entitled to absolute immunity.

## II.  DISCUSSION

We first consider whether Jean Moreau's breach-of-contract claim is barred.  We then consider whether its quantum meruit claim is barred and, in doing so, address whether HCC enjoys absolute immunity.

### A.  Procurement Act

The Procurement Act establishes "the public policies pertaining to governmental procurement from nongovernmental sources."  Code § 2.2-4300.  It requires that "[a]ll public contracts with nongovernmental contractors . . . for the purchase of services . . . shall be awarded" in accordance with its provisions, "unless otherwise authorized by law." Code § 2.2-4303.  There is no dispute in this case that the contract between HCC and Jean Moreau is a "public contract" under the Procurement Act.

"The General Assembly has imposed certain procedures and limitations on the processing and enforcement of contract claims which are subject to the Procurement Act."  Flory Small Business Dev. Ctr. v. Commonwealth, 261 Va. 230, 238, 541

6

S.E.2d 915, 919 (2001). Among the procedures it has prescribed is that

> [c]ontractual claims, whether for money or other relief, shall be submitted in writing no later than 60 days after receipt of final payment; however, written notice of the contractor's intention to file a claim shall be given at the time of the occurrence or at the beginning of the work upon which the claim is based.

Code § 2.2-4363(C)(1). "These are mandatory, procedural requirements which must be met in order for a court to reach the merits of a case." Flory, 261 Va. at 238, 541 S.E.2d at 919.

The circuit court concluded that Jean Moreau failed to submit a claim within 60 days after final payment, because its October 24 letter to HCC was "not a claim, [but rather] an invitation to settle." "And, even if [that letter] were a claim," the circuit court alternatively held, "it was more than 60 days since final payment was made on July 31st, 2006, [and was] therefore barred by the [Procurement Act]."

Jean Moreau contends that the circuit court was wrong because "HCC never provided notice of final payment," and thus the 60-day limitations period in which to submit a claim never began to run. Jean Moreau further argues that, "even assuming the Court could treat the July 31, 2006 payment as 'final payment' for the purposes of § 2.2-4363," its June 9 letter to HCC "assert[ed] a claim for the additional development fees on

7

the Springdale project," and "therefore satisfied the Procurement Act."

We disagree. Nothing in Code § 2.2-4363 requires a public body to give notice that a payment is final before the 60-day limitations period begins to run, and Jean Moreau cites no other section of the Procurement Act that sets forth such a requirement. Nonetheless, HCC's May 8 and June 19 letters to Ms. Moreau notified Jean Moreau that, after the invoices from the 2005-2006 fiscal year were satisfied, the Commission would make no more payments under the parties' contract. In the May 8 letter, HCC said that it had "voted not to continue and fund its contract with Jean Moreau . . . beyond the current fiscal year ending June 30, 2006." And in the June 19 letter, HCC said that, "[u]pon legal review, the Commission believes that you have been fully and fairly compensated, and the Commission has honored every term of its contract with you."

Moreover, Jean Moreau's June 9 letter to HCC was not a claim "in writing no later than 60 days after receipt of final payment." Code § 2.2-4363(C)(1). In that letter, Ms. Moreau said that she wanted to give HCC "a 'heads up' that [she] intend[ed] to seek legal remedy regarding [the deferred] fees" under the parties' contract. This statement, to be sure, gave HCC notice of Jean Moreau's intention to file a claim, thereby satisfying the requirement imposed by Code § 2.2-4363(C)(1)

8

that written notice of the intent to file a claim be given "at the time of the occurrence." But it was not itself a claim.

While Code § 2.2-4363 does not prescribe exactly what a writing must contain to be considered a "claim," our prior cases suggest that it requires more than what Ms. Moreau included in the June 9 letter. For instance, in Flory, 261 Va. at 234, 541 S.E.2d at 917, the contractor's claim consisted of "invoices for reimbursement of approximately $89,000 for services rendered and expenses incurred." And in Welding, Inc. v. Bland County Service Authority, 261 Va. 218, 227, 541 S.E.2d 909, 914 (2001), the contractor alleged that, within 60 days of final payment, it made a claim by letter for $100,000 for additional work.

Although the notice of intent need not " 'be separate and distinct from the claim itself,' " Commonwealth v. AMEC Civil LLC, 280 Va. 396, 409, 699 S.E.2d 499, 506 (2010) (quoting Flory, 261 Va. at 238, 541 S.E.2d at 919), a claim is not necessarily submitted when a notice of intent is given. That is the case here. Jean Moreau's June 9 letter gave notice of its intent to file a claim for the deferred development fees, but did not make a claim for those fees. The earliest Jean Moreau arguably submitted such a claim was in its October 4 letter – more than three weeks after the 60-day limitations period had expired.

9

In sum, Jean Moreau did not comply with the "mandatory, procedural requirements" of the Procurement Act in bringing its breach-of-contract claim against HCC.  Flory, 261 Va. at 238, 541 S.E.2d at 919.  Specifically, it did not submit the claim to HCC within 60 days after final payment as required under Code § 2.2-4363(C)(1).  For this reason, we hold that the circuit court did not err in concluding that the claim was barred.

## B.  Sovereign Immunity

" '[T]he doctrine of sovereign immunity,' " we have often said, " 'is alive and well in Virginia.' "  Gray v. Virginia Sec'y of Transp., 276 Va. 93, 101, 662 S.E.2d 66, 70 (2008) (alteration in original) (internal quotation marks omitted) (quoting Messina v. Burden, 228 Va. 301, 307, 321 S.E.2d 657, 660 (1984)).  " 'Sovereign immunity is a rule of social policy, which protects the state from burdensome interference with the performance of its governmental functions and preserves its control over state funds, property, and instrumentalities.' "  City of Chesapeake v. Cunningham, 268 Va. 624, 633, 604 S.E.2d 420, 426 (2004) (quoting City of Virginia Beach v. Carmichael Dev. Co., 259 Va. 493, 499, 527 S.E.2d 778, 781 (2000)).

Sovereign immunity is an ancient doctrine. Indeed, as the United States Court of Appeals for the Fourth Circuit has observed:

> The jealous protection of the sovereign from suit is deeply rooted in the common law and has been considered a part of the plan of our Constitution since before its ratification. In arguing for the Constitution's organization of the judicial branch, Alexander Hamilton wrote that "it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent."

Research Triangle Inst. v. Board of Governors of the Fed. Reserve Sys., 132 F.3d 985, 987 (4th Cir. 1997) (footnotes omitted) (quoting The Federalist No. 81, at 511 (Alexander Hamilton) (B. F. Wright ed. 1961)).

The shield of sovereign immunity does not just apply to the State; it also applies to municipal corporations under certain circumstances. In Virginia, municipal corporations perform two types of functions — governmental and proprietary. Gambrell v. City of Norfolk, 267 Va. 353, 357, 593 S.E.2d 246, 249 (2004). Municipal corporations are immune from liability "when performing governmental functions, but are not when exercising proprietary functions." Carter v. Chesterfield County Health Comm'n, 259 Va. 588, 590, 527 S.E. 2d 783, 785 (2000).

11

There is no dispute that HCC is entitled to the status of a municipal corporation, and we have previously treated it as such.  See id.

### 1.  The immunity of municipal corporations from quantum meruit claims.

Jean Moreau contends that municipal corporations are not immune from quantum meruit claims, regardless of whether the claims arise out of the exercise of governmental or proprietary functions.  To make this argument, it relies on Mount Jackson v. Nelson, 151 Va. 396, 145 S.E. 355 (1928).  In that case, the town of Mount Jackson contracted with the owners of a gas station to build a water main.  Id. at 399, 145 S.E. at 355.  The main was intended to allow the town to sell surplus water to new customers at a profit, an exercise of its proprietary or business function.  Id. at 404, 145 S.E. at 357.  The owners built the main, but the town refused to pay.  Id. at 399, 145 S.E. at 355.  The owners thereafter sued the town.  On appeal, we held that they could recover on a quantum meruit claim,  Id. at 407, 145 S.E. at 358.  We explained:

> The town has retained and controls this main designed for the benefit of consumers generally through which they can deliver water at a profit.  In such circumstances the obligation to pay is as complete as it would be to pay for a right of way bought and held for this pipe.  No one would claim that it could keep such an easement and not pay for it.

Id.

Roughly ten years later, we confronted similar facts in Leonard v. Town of Waynesboro, 169 Va. 376, 193 S.E. 503 (1937). There a homeowner sued the town of Waynesboro to recover the costs of constructing a water main. Id. at 378, 193 S.E. at 503. The town was using the main without the homeowner's consent to sell water to her neighbors. Id. at 380, 193 S.E. at 504. Relying on Mount Jackson, we held that "where a town takes over and controls a water line built by others and uses it for the benefit of the town and consumers generally, and through it delivers water for a profit, it is obligated to pay, on a quantum meruit, those who constructed the line." Id. at 383, 193 S.E. at 506. We reasoned:

> When a municipality enters into the business of operating a water plant it is acting in its proprietary, or quasi private, capacity for the private advantage of its inhabitants and of the municipality itself. It exercises business functions rather than those governmental in their nature. In the exercise of those functions the municipality is governed largely by the same rules as those applicable to private corporations or individuals engaged in the same business. Transactions touching such business should receive the same construction by the courts as like ones between private corporations or individuals.

Id. at 383-84, 193 S.E. at 506.

In a more recent decision, citing Mount Jackson and Leonard, we noted that "[r]ecovery on the basis of quantum meruit has been allowed against a municipality exercising a

13

proprietary function."  Flory, 261 Va. at 237 n.3, 541 S.E.2d at 919 n.3.  We have not before now, however, specifically addressed whether recovery on the basis of quantum meruit is also allowed against municipal corporations exercising governmental functions.  Jean Moreau urges us to hold that "[t]he rationale set forth in Mount Jackson applies equally to proprietary or governmental functions."

        We disagree.  In Flory, we reaffirmed that the Commonwealth is immune from quasi-contractual claims.  Id. at 237, 541 S.E.2d at 918.  We began our analysis by summarizing the applicable principles:

> Under the common law, sovereign immunity did not shield the sovereign from liability for its valid contracts. However, quasi-contractual doctrines are premised on the absence of a valid contract.  The Commonwealth's common law liability for its contracts does not encompass quasi-contractual claims, and any relief based on such claims must be authorized through a statute abrogating the Commonwealth's sovereign immunity.

Id. at 236-37, 541 S.E.2d at 918 (internal quotation marks and citation omitted).  Finding no "statutory or case authority . . . for the proposition that the Commonwealth has waived its immunity from liability under theories of quasi-contract," we went on to conclude that it could not be held liable on claims for quantum meruit or contract implied in law.  Id. at 237, 541 S.E.2d at 919.

14

When municipal corporations exercise governmental functions, they act as arms or agencies of the State. Southern Railway Co. v. City of Danville, 175 Va. 300, 305, 7 S.E.2d 896, 898 (1940). For this reason, we have long held that municipal corporations share in the Commonwealth's immunity from tort claims when they are performing such functions. See, e.g., Carter, 259 Va. at 590-91, 527 S.E.2d at 785. We see no reason why we should hold differently for quasi-contractual claims. If municipal corporations act as arms or agencies of the State when they exercise governmental functions, then they should be protected — like the Commonwealth — from both tort and quasi-contractual claims. We therefore conclude that municipal corporations performing governmental functions are immune from quantum meruit claims and that recovery against municipal corporations on a quantum meruit basis is limited to proprietary functions.

2. HCC's claim of absolute immunity.

In its assignment of cross-error, HCC asserts that the circuit court erred in holding that it was not entitled to absolute immunity from quantum meruit claims. HCC contends that it should enjoy the same level of immunity that is afforded to the entity that created it — Chesterfield County. Because counties, as opposed to municipalities, are entitled to absolute immunity as local subdivisions of the State, see

15

<u>Mann v. County Board of Arlington County</u>, 199 Va. 169, 174, 98 S.E.2d 515, 518-19 (1957), HCC maintains that it, too, is entitled to absolute immunity.  HCC accordingly claims that it is immune from Jean Moreau's quantum meruit claim, regardless of whether the development and operation of Springdale serves a proprietary or governmental function.

In support of its argument, HCC relies on <u>Virginia Electric & Power Co. v. Hampton Redevelopment and Housing Authority</u>, 217 Va. 30, 225 S.E.2d 364 (1976).  There we considered, among other things, whether the Housing Authority was a municipal corporation.  <u>Id.</u> at 33, 225 S.E.2d at 367.  In concluding that it was, we said that, "for purposes of uniformity in determining tort liability, a municipal housing authority should be held to occupy the same status as the municipality which brings it into existence and oversees its activities."  <u>Id.</u> at 34, 225 S.E.2d at 368.

While a number of years ago the Attorney General's office read this language from <u>Hampton Redevelopment</u> to mean that entities created by counties enjoy absolute immunity, <u>see</u> 1997 Op. Atty. Gen. 123, 124; 1995 Op. Atty. Gen. 72, 73, the circuit courts have not routinely agreed, and today we reject such an interpretation.  A close reading of <u>Hampton Redevelopment</u> makes plain that we did not intend to formulate a new test for determining the appropriate level of immunity

16

due a municipal corporation. The language that HCC points to must be viewed in context. It was taken from our analysis of whether the Housing Authority was a municipal corporation. In the sentence preceding it, we said, in reference to an earlier decision, <u>City of Richmond v. Richmond Metropolitan Authority</u>, 210 Va. 645, 172 S.E.2d 831 (1970), that there was "no valid reason for declaring that an entity occupies the status of a municipal corporation for tax refund purposes and not declaring that a similar entity occupies the same status for purposes of determining its immunity from tort liability." <u>Hampton Redevelopment</u>, 217 Va. at 34, 225 S.E.2d at 368. It was against this backdrop that we held that the Housing Authority was entitled to the status of a municipal corporation for purposes of determining its tort immunity. <u>Id.</u> We did not intend that a municipal corporation created by a county have a different status for immunity purposes than a municipal corporation created by a municipality.

Indeed, in the 30-plus years since <u>Hampton Redevelopment</u> was decided, we have not once interpreted the language that HCC relies on in the manner that it urges. Rather, we have consistently reaffirmed that whether an entity is an arm or agency of the State, and therefore entitled to absolute immunity, depends on the nature of the entity. <u>See, e.g.</u>, <u>Prendergast v. Northern Virginia Regional Park Authority</u>, 227

Va. 190, 194, 313 S.E.2d 399, 401 (1984) ("The correct approach is the one we have long employed in the Commonwealth: the attributes of the particular entity which seeks immunity must be examined to determine whether it is an 'arm' of the Commonwealth.").

In Prendergast, the circuit court held that the Northern Virginia Regional Park Authority was "generally immune from liability in tort" because it was created under the Park Authorities Act, former Code §§ 15.1-1228 through -1238.1,[*] which was enacted pursuant to Article XI, Section 1 of the Constitution. Id. at 192-93, 313 S.E.2d at 400-01. We reversed, concluding that, because the Park Authority was "a creature of one or more localities and [was] essentially subject to their control," it was not an arm or agency of the State, and accordingly was not entitled to absolute immunity. Id. at 194, 313 S.E.2d at 401. In our analysis, we said that we were applying the same approach that was applied in Hampton Redevelopment – in which, after concluding that the Housing Authority was a municipal corporation, we addressed whether its operation and maintenance of a housing complex served a governmental or proprietary function. 217 Va. at 34, 225 S.E.2d at 368.

---

[*] See current Code §§ 15.2-5700 through 15.2-5714.

If <u>Hampton Redevelopment</u> meant what HCC now contends that it does, then we would surely have considered as part of our analysis in <u>Prendergast</u> whether the Park Authority was created by counties or municipalities, or a combination of both (which it was).  For if it were really true that entities created by counties enjoy absolute immunity under <u>Hampton Redevelopment</u>, then that inquiry would have been a crucial step in our analysis — but it played no part.

Because HCC's interpretation of <u>Hampton Redevelopment</u> is not supported by our precedents, and because it would lead to like entities performing the same function being treated differently, we reject it.  We consequently hold that an entity is not entitled to absolute immunity simply because it was created by a county and not a municipality.

3.  HCC's immunity from Jean Moreau's quantum meruit claim.

As HCC does not share in the absolute immunity enjoyed by Chesterfield County, whether it is immune from Jean Moreau's quantum meruit claim depends on whether the development and operation of Springdale serves a governmental or proprietary function.  This is because, as we held above, municipal corporations enjoy immunity from quantum meruit claims when exercising governmental functions, but not when performing proprietary functions.

19

Jean Moreau asserts that the circuit court erred in ruling that HCC's development and operation of Springdale served a governmental function.  Whether a function is governmental or proprietary is a mixed question of law and fact.  "Because the circuit court heard the evidence ore tenus, its factual findings are entitled to the same weight as a jury verdict, and [we are] bound by [its] findings of fact unless they are plainly wrong or without evidence to support them."  Mulford v. Walnut Hill Farm Group, LLC, 282 Va. 98, 106, 712 S.E.2d 468, 473 (2011) (first alteration in original) (internal quotation marks and citation omitted).  We review de novo, however, the ultimate conclusion as to whether the development and operation of Springdale served a governmental or proprietary function.  See id.

"A function is governmental in nature if it is directly related to the general health, safety, and welfare of the citizens."  Gambrell, 267 Va. at 357, 593 S.E.2d at 249; see also Ashbury v. City of Norfolk, 152 Va. 278, 282, 147 S.E. 223, 224 (1929) ("The performance of duties that relate to the preservation of the public health and the care of the sick is [a] concern to the public as a whole; in executing this function the municipality . . . perform[s] governmental . . . duties." (internal quotation marks and citation omitted)). "In contrast, a function is proprietary in nature if it

20

involves a privilege and power performed primarily for the benefit of the [municipal corporation]." Gambrell, 267 Va. at 357, 593 S.E.2d at 249. "[W]hen governmental and proprietary functions coincide, the governmental function is the overriding factor and the doctrine of sovereign immunity will shield the [municipal corporation] from liability." Carmichael, 259 Va. at 499, 527 S.E.2d at 782 (internal quotation marks and citation omitted).

This is not the first time that we have had to consider whether HCC was engaged in a governmental or proprietary function. In Carter, 259 Va. at 590, 527 S.E.2d at 784, the administrator of Vance W. Carter Jr.'s estate sued HCC alleging that the negligent acts of Lucy Corr Village employees caused Carter's death. HCC filed a special plea of sovereign immunity. Id. The circuit court sustained the plea, holding that the operation of Lucy Corr Village was a governmental function and that, as a result, HCC was immune from the administrator's claim. Id. We affirmed, concluding that "the provision of nursing services by [HCC] was not a ministerial act of a proprietary nature, but an exercise of [Chesterfield] County's police power for the common good and, thus, was governmental in nature." Id. at 594; 527 S.E.2d at 787.

Jean Moreau claims that Springdale is distinguishable from the nursing-care facility at issue in Carter. It argues that, while operating a nursing-care facility for the general welfare may be a governmental function, providing an independent-living facility is not. According to Jean Moreau, "[t]he resolution creating HCC did not declare any public need for such a development, and constructing residential neighborhoods for independent seniors certainly was not one of the declared purposes [of the Commission]." "Rather," Jean Moreau contends, "Springdale is directly analogous to the housing complex" at issue in Hampton Redevelopment, the operation and maintenance of which we held served a proprietary function. 217 Va. at 36, 225 S.E.2d at 369.

To support its contention that Springdale is a proprietary function, Jean Moreau points to the following facts: (1) "HCC [is] not licensed to provide any nursing care at Springdale"; (2) "HCC intend[s] Springdale to be a discrete component of [the Lucy Corr Village] campus, with few economic or physical links binding it to the nursing-home and assisted-living facilities"; (3) "HCC registered with the State Corporation Commission as a 'Type C' CCRC," that is, a CCRC "in which the independent-living residents [are] not provided guaranteed rates or guaranteed admission to HCC's assisted-living and nursing-home facilities"; (4) "Springdale ha[s] a

22

separate entrance from the other parts of the [Lucy Corr Village] campus"; and (5) "not only could Springdale's finances be assessed independently from HCC's assisted-living and nursing-home components, but Medicare actually required HCC to do so."

Because the determination whether the development and operation of Springdale served a governmental or proprietary function is a mixed question of law and fact, it is necessary for us to review the circuit court's factual findings. Unlike the findings and record presented for review in Hampton Redevelopment, 217 Va. at 34, 225 S.E.2d at 368, where the circuit court merely stated that the operation of a housing complex would " 'obviously be, as a normal matter, a proprietary function,' " the circuit court here listed a host of factors indicating a governmental function:

> (1) The creation of HCC in 1993 upon the Chesterfield County Board of Supervisors' resolution citing "the public health and welfare, including the welfare of persons of low income in the county and surrounding areas, require the acquisition, construction, and operation of public hospital facilities, particularly nursing homes, for inhabitants of the County and surrounding areas."
>
> (2) The 2003 Chesterfield County Committee on the Future Report's recommendation that the county should encourage residential development catering to older adults to meet the needs of its aging population.
>
> (3) Lucy Corr Village became a CCRC in 2005 after beginning to add the independent-living component.

23

(4) Health care commissions are authorized, by statute, to operate, among other things, nursing homes, assisted-living facilities, continuing-care facilities, self-care facilities, and facilities for the residence or care of the elderly.

(5) "In order to be accepted by the State Bureau of Insurance as a registered continuing care facility, [Lucy Corr Village] was legally required to make available to its residents board and nursing services, which it did in this case."

(6) "[T]he property for Springdale was donated by a public entity, Chesterfield County, to another public entity, HCC. Local governments are not permitted to give away valuable public assets to private businesses whose purpose is to enrich [their] owners."

(7) Springdale "provides 24-hour emergency response and passive check in system."

(8) "Springdale . . . is [a] part of the continuum of care" offered at Lucy Corr Village and cannot be separated from the nursing-care or assisted-living facilities.

Despite Jean Moreau's attempt to distinguish Springdale from the nursing-care facility at issue in Carter, we agree with the circuit court that it, too, serves a governmental function. To begin with, we disagree with Jean Moreau that HCC's purpose does not encompass Springdale. As noted earlier, Chesterfield County created HCC for the purpose of operating (among other things) "hospital or health center facilities." These facilities, by statute, include "continuing care facilities" and "facilities for the residence or care of the elderly." Code § 15.2-5201. Springdale falls under both categories: it is a necessary component of a

continuing care facility (Lucy Corr Village), and it is a facility for the residence of the elderly (the average age of residents is 80).

We further disagree with Jean Moreau that Springdale is analogous to the housing complex at issue in Hampton Redevelopment.  As the circuit court found, Springdale is more than just a residential development; it is "a part of a continuum of health care services beginning with the nursing home care facility" and "cannot [be] separate[d]."  Springdale serves the needs of those Chesterfield County seniors who do not yet require the higher level of care that is provided at the other Lucy Corr Village facilities.  In particular, it allows them to continue to live on their own as long as they are able, while still offering them the security of such services as "24-hour emergency response and passive check in system."

Because Springdale fits comfortably within HCC's purpose, and because it is an inseparable part of the continuum of care offered at Lucy Corr Village, we conclude that, like the nursing-care facility, it serves a governmental function.  We accordingly hold that the circuit court did not err in concluding that HCC was immune from Jean Moreau's quantum meruit claim for its development and operation of Springdale.

### III.  CONCLUSION

25

For the foregoing reasons, we will affirm the judgment of the circuit court.

Affirmed.

JUSTICE McCLANAHAN, concurring in part and dissenting in part.

I concur in Part II.A. of the majority opinion holding that the circuit court did not err in concluding Jean Moreau's breach of contract claim against HCC was barred for failure to comply with the Procurement Act's contractual claims procedure. I dissent, however, from Part II.B. of the majority opinion holding that the circuit court did not err in concluding that HCC was immune from Jean Moreau's quantum meruit claim.[1]

"Sovereign immunity protects municipalities from tort liability arising from the exercise of governmental functions." City of Chesapeake v. Cunningham, 268 Va. 624, 634, 604 S.E.2d 420, 426 (2004) (emphasis added). We have not heretofore recognized any such protection for municipalities from liability upon quantum meruit. To the contrary, we have allowed recovery from municipalities upon quantum meruit. See, e.g., Leonard v. Town of Waynesboro, 169 Va. 376, 193

---

[1] As to this claim, the only issue before the Court is whether it is barred by the doctrine of sovereign immunity. Thus, we do not address the underlying merits of Jean Moreau's quantum meruit claim.

S.E. 503 (1937); Mount Jackson v. Nelson, 151 Va. 396, 145 S.E. 355 (1928). In fact, as we have noted, it is "well settled in most jurisdictions that a municipality . . . may become obligated upon implied contract to pay the reasonable value of benefits accepted or appropriated by it as to which it has the general power to contract." Leonard, 169 Va. at 384, 193 S.E. at 506 (internal quotation marks and citation omitted).[2] Therefore, liability will be imposed "where money or other property of a party is received under such circumstances that the general law, independently of the express contract, implies an obligation upon the city to do justice with respect to the same." Id.

In neither Leonard nor Mount Jackson did this Court suggest that sovereign immunity was available to

---

[2] See, e.g., City of St. Marys v. Stottler Stagg & Assocs., 292 S.E.2d 868 (Ga. Ct. App. 1982) (quantum meruit available against city); Lanphier v. Omaha Public Power Dist., 417 N.W.2d 17 (Neb. 1987) (public power district entitled to quantum meruit recovery where it conferred benefit on city in providing services); Morgenroth & Assocs., Inc. v. Town of Tilton, 431 A.2d 770 (N.H. 1981) (town not immune from liability for implied in law contracts); Wanaque Borough Sewerage Auth. v. Township of West Milford, 677 A.2d 747 (N.J. 1996) (township liable in quasi-contract for benefits received); Hurdis Realty, Inc. v. Town of North Providence, 397 A.2d 896, 897 (R.I. 1979) ("A municipality, no less than a private individual, may be liable upon the principle of unjust enrichment when it has enjoyed the benefit of work performed and when no statute forbids or limits its power to contract therefore."); City of Ingleside v. Stewart, 554 S.W.2d 939 (Tex. Civ. App. 1977) (contractor could seek recovery under quantum meruit against city).

27

municipalities for quantum meruit claims that were related to the exercise of governmental functions.[3] And the distinctions we have made between governmental and proprietary functions in the context of tort liability have no logical application to claims under quantum meruit. Whereas a governmental function has been protected by sovereign immunity because it entails "the exercise of an entity's political, discretionary, or legislative authority," a proprietary function has not been afforded such protection because it "is a ministerial act and involves no discretion." Cunningham, 268 Va. at 634, 604 S.E.2d at 426. In my view, the decision to accept benefits without payment therefore is, by its very nature, a ministerial act involving no discretion. As we stated in Leonard, the obligation to pay the reasonable value of benefits accepted is an obligation "'to do justice,'" 169 Va. at 384, 193 S.E. at 506 (citation omitted), and, thus, should

---

[3] In Flory Small Business Dev. Ctr. v. Commonwealth, 261 Va. 230, 237 n. 3, 541 S.E.2d 915, 919 n.3 (2001), we stated that recovery was allowed "against a municipality exercising a proprietary function" in Leonard and Mount Jackson. However, there was no discussion of sovereign immunity in Leonard and Mount Jackson. Indeed, in Cunningham, we rejected the plaintiff's claim that our decision in Leonard stood for the proposition that sovereign immunity is unavailable in all claims related to municipal waterworks. We explained that Leonard involved "the liability of a municipality under a theory of quantum meruit for the construction of a water line." 268 Va. at 635 n.7, 604 S.E.2d at 427 n.7. In doing so, we clarified that recovery was allowed in Leonard because the claim was in quantum meruit, not because it involved a proprietary function.

not depend on the classification of the obligation as either governmental or proprietary.

Nevertheless, even if I could agree with the majority that a municipal corporation should be immune from quantum meruit claims when acting in a governmental capacity, I see no appreciable distinction between this independent living facility and the housing project in Virginia Electric & Power Co. v. Hampton Redevelopment & Housing Authority, 217 Va. 30, 225 S.E.2d 364 (1976).  The Court's rationale for finding the operation of the housing project to be proprietary is equally applicable here.

> In operating and maintaining its housing project, the Authority assumes the role ordinarily occupied by a private landlord, and performs functions which could as well be performed by private enterprise.  The special service performed by the Authority inures to the benefit of a few rather than to the common good of all.  And the necessity for the service bears only incidental relation to the protection of the life, health, property, and peace of the citizens of the whole municipality where the service is performed.

Id. at 36, 225 S.E.2d at 369 (internal quotation marks and citations omitted).  Furthermore, the claim in this case does not arise out of the operation of the facility or the provision of services within this facility.  Cf. Carter v. Chesterfield County Health Comm'n, 259 Va. 588, 527 S.E.2d 783 (2000).  Instead, it arises out of the ministerial and proprietary act of allegedly retaining an unearned benefit.

29

Therefore, I would hold that the HCC was not entitled to the protection of sovereign immunity for Jean Moreau's quantum meruit claim.